UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


| | | |
|---|---|---|
| ELI LILLY AND COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:03-cv-1504-DFH-TAB |
| | ) | |
| EMISPHERE TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |


FINDINGS OF FACT AND CONCLUSIONS OF LAW
ON COUNTERCLAIM FOR BREACH OF CONTRACT


Beginning in February 1997, plaintiff Eli Lilly and Company and defendant

Emisphere Technologies, Inc. agreed to collaborate in research on new chemical

"carrier" compounds.  The goal was to use these molecules to deliver therapeutic

proteins to patients orally.  Through mechanisms that are not well understood,

the carriers may enable the therapeutic proteins to bypass the digestive processes.

Those processes ordinarily break down proteins into their component amino acids,

but with carriers, the proteins may stay intact and cross the intestinal membrane

to enter the patient's bloodstream.  If successful, such research could make it

much easier to treat patients with proteins such as insulin that have been

administered in the past through injections or other methods that introduce the

proteins directly into the blood.  The research project was focused on finding a

carrier to enable oral delivery of parathyroid hormone (PTH), which is used in treating osteoporosis and currently is administered by injections.[1]

The research relationship required Lilly and Emisphere to share valuable information. The relationship has broken down in a dispute over whether Lilly breached the relevant contracts by pursuing its own secret research projects with Emisphere's proprietary carriers. On September 4, 2003, an international patent application by Lilly was published for a carrier compound for the delivery of a particular glucagon-like peptide (GLP) known as "GLP-1." GLP is a natural protein produced by the intestine. It is used to treat patients for diabetes and obesity. It is not currently available for oral delivery.

After reviewing the Lilly patent application, Emisphere notified Lilly on September 26, 2003 that it believed Lilly had breached contract provisions restricting Lilly's use of Emisphere's technology and giving Emisphere ownership of patent rights to Lilly inventions derived from Emisphere's technology. Lilly responded by filing this action for declaratory judgment. After a period of negotiations proved unfruitful, Emisphere notified Lilly in August 2004 that it was terminating the relevant contracts. By agreement of the parties, Emisphere's

---

[1]There appears to be no accepted, sharp boundary between proteins and smaller peptide molecules, which also consist of chains of amino acids. One internal Lilly document, for example, refers to PTH as both a protein and a peptide. Ex. 226 at 001. No legal issues in this case depend on the difference. The court uses the term "protein" to describe any of the macromolecules that were of interest to the parties in their research on oral delivery mechanisms.

counterclaim for breach of contract was tried to the court in January and February 2005 to determine whether Emisphere is entitled to terminate the agreements and is free to pursue collaboration with another major pharmaceutical company.

As explained below, Emisphere has proved that Lilly breached the relevant contracts, and Emisphere is entitled to terminate the contracts effective the date of its termination letter, August 23, 2004.  Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the court now states its findings of fact and conclusions of law on the counterclaim.  As the parties agreed in their contracts, the court applies New York law to the dispute.  The court has blended the findings of fact and conclusions of law in one narrative.  Where the court has cited specific exhibits and testimony in support of particular points, the court does not necessarily mean to imply that the cited evidence is the only supporting evidence.

I.    *The Parties and the Research Problem*

Plaintiff Lilly is a major pharmaceutical company with annual revenues of more than ten billion dollars.  Emisphere is a relatively new and much smaller company.  Lilly is an Indiana citizen for purposes of federal diversity jurisdiction.  Emisphere is a citizen of Delaware and New York.  The matter in controversy has a value well in excess of the jurisdictional limit under 28 U.S.C. § 1332.  The court has jurisdiction of the subject matter and jurisdiction over the parties.

Emisphere's principal assets are technology and know-how involving a family of chemical compounds that Emisphere calls "carrier" compounds. The carriers may offer a solution to a basic biological barrier to some forms of drug treatments. Many human diseases can be treated by introducing proteins into the body, such as insulin to treat diabetes. The human digestive system is designed to break down proteins into their component amino acids. Tr. 456. If a doctor tries to treat a patient by administering a therapeutic protein orally, the patient's digestive system will break it down so that it loses any therapeutic value.

Emisphere believes that its carrier compounds can be used with therapeutic proteins to protect the proteins from the digestive mechanisms, so that the therapeutic proteins may pass intact into the bloodstream to provide effective therapy to the patient. This prospect is, to put it mildly, very interesting for Lilly and other pharmaceutical companies. In general, it is easier, cheaper, and more effective to deliver medicine orally than through injections or other methods that bypass the digestive system. For example, this technology might allow a diabetes patient in the future to take an insulin pill instead of needing frequent hypodermic injections of insulin.

II.    *The Research Collaboration Begins*

In 1996, Lilly and Emisphere began negotiating a possible research collaboration on carrier compounds that could be used for oral administration of parathyroid hormone (PTH) and human growth hormone (hGH). See Ex. 13.

Almost all the evidence here deals with the work on PTH, which is produced by the parathyroid glands. Its principal role in the body is the regulation of bone metabolism. PTH can be used to treat osteoporosis, a disease that weakens bones, especially in older women. Lilly has introduced to the market an injectable PTH product called Forteo, but PTH is not currently available for oral delivery.

On February 26, 1997, Emisphere and Lilly signed their first Research Collaboration and Option Agreement, called RCOA I. Ex. 1. In RCOA I, Lilly and Emisphere agreed to collaborate on a research and development program ("the Program") to research the use of "Emisphere Technology" for oral delivery of PTH and related compounds, as well as some non-oral methods of delivery. As part of RCOA I, the parties agreed that Emisphere would grant Lilly an option for an exclusive worldwide license to make and use the Emisphere carrier technology to develop oral PTH products. Lilly could exercise that option by giving notice to Emisphere and by paying Emisphere a substantial sum of money. RCOA I, § 2.1. In the negotiations on RCOA I, the parties also agreed on the terms of the separate license agreement that would take effect if and when Lilly exercised the option. That license agreement is known as the PTH License Agreement. See Ex. 2.

Both sides were represented by highly capable counsel in negotiating and drafting the agreements. The agreements are superb examples of sophisticated and complex draftsmanship, often with multiple layers of many careful definitions of key terms, as noted below.

III.    *The Key Contract Terms*

RCOA I took effect in February 1997 and expired in February 1999.  In Section 1.1, Emisphere agreed to "make available to Lilly access to all Emisphere Technology relevant for the Program," *i.e.*, for the PTH research.  The parties defined "Emisphere Technology" broadly in the preamble to RCOA I as:

> proprietary synthetic chemical compounds that enable the delivery of therapeutic macromolecules and other compounds that are not currently deliverable by oral means or by certain non-oral means (including all related patents, patent applications and Know-How presently owned by Emisphere and all patents, patent applications, and Know-How relating to inventions developed by Emisphere pursuant to the Program . . . ).

Ex. 1.  RCOA I included confidentiality provisions in Section 5.  Those provisions did not restrict distribution within Lilly of information relating to the Program, nor did RCOA I restrict Lilly's internal use of information obtained in the PTH Program.  See Ex. 23.

Research collaboration began in 1997 after execution of RCOA I.  On March 6th and 7th, scientists from both companies met in Indianapolis.   Ex. 17.  Emisphere scientists identified the best carrier candidates for use with PTH and provided specific test results on PTH experiments they had already conducted, including studies of primates.  At the meeting, Emisphere agreed to provide carrier samples and some methods and protocols for producing the carriers.  Ex. 17 at 523.  By May 6, 1997, Lilly scientists had synthesized several Emisphere carriers for themselves, with critical help from Emisphere scientists.  See Ex. 724.

The early work on carriers for PTH was sufficiently promising that Lilly paid Emisphere $4 million in April 1998 to exercise the PTH option.  Section 2.1 of the PTH License Agreement provided that Emisphere granted Lilly during the term of the agreement:

> an exclusive license to use (a) the Emisphere Patents, the Emisphere Program Patents and Emisphere's share of the Joint Patents for the Field, and (b) the Emisphere Know-How, the Emisphere Program Know-How and Emisphere's share of the Joint Know-How for the Field.  All proprietary rights and rights of ownership with respect to the Emisphere Technology and Emisphere Program Technology shall at all times remain solely with Emisphere unless otherwise specified in this Agreement.  *Lilly shall not have any rights to use the Emisphere Technology or Emisphere Program Technology other than insofar as they relate directly to the Field and are expressly granted herein.*

Ex. 2, § 2.1 (emphasis added).  Emisphere contends that Lilly breached the final sentence in this provision beginning in 2001 by carrying out secret, independent research projects on using Emisphere's carriers with proteins other than PTH, as described in detail below.

The PTH License Agreement also included detailed provisions for confidentiality, including limits on Lilly's internal distribution and use of information relating to the PTH and carrier research:

> 11.1   The Parties acknowledge that it may be necessary, from time to time, to disclose to each other confidential and proprietary information, including without limitation, inventions, works of authorship, trade secrets, specifications, designs, data, know-how and other information, relating to the Field, the Compounds, the Carriers, the Products, processes, and services of the disclosing Party or regarding the Emisphere Technology or Emisphere Program Technology or the Lilly Technology or the Lilly Program Technology.  The foregoing shall be referred to collectively as "Confidential

Information".  Any Confidential Information revealed by a Party to another Party shall be used by the receiving Party exclusively for the purposes of fulfilling the receiving Party's obligations under this Agreement.

11.2  Each Party agrees to disclose Confidential Information of another Party only to those employees, representatives and agents requiring knowledge thereof in connection with their duties directly related to the fulfilling of the Party's obligations under this Agreement. * * *

Ex. 2.  Emisphere contends that Lilly also violated Section 11.2 beginning in 2001 by having the employees who worked on the PTH program provide confidential Emisphere information to the Lilly team working on the secret projects researching Emisphere's carriers with proteins other than PTH.

IV.    *The PTH Research Continues*

Research on use of Emisphere's carriers with PTH continued in 1998.  The collaboration made Emisphere nervous about the confidentiality of its valuable information.  Lilly's Dr. Henry Havel – a key figure in this case, who worked with Emisphere from the beginning of the PTH project – had a telephone conversation with Emisphere's John Smart on October 29, 1998.  Smart expressed concern about whether Lilly was trying to get into Emisphere's business.  Lilly's Havel reported:  "I tried to reassure him that we have no interest in duplicating their technology, but we have a strong need to understand how the carriers work for future development."  Ex. 492.

Dr. Havel's comment reflects one recurring theme of the research on Emisphere carriers.  Nobody with Emisphere or Lilly really understood how the

carriers work, their "mechanism of action."  Of course, it is possible for the carriers to work in practice even if the mechanism of action is not understood. Lilly had concerns, however, about its ability to secure regulatory approval for a product if it could not explain how the product worked.  Tr. 473 (Lilly's Khan); Tr. 851-52 (Lilly's Havel).  For example, perhaps the carriers might also expose the bloodstream to other proteins and large molecules in the digestive system.

In August 1998, Lilly and Emisphere chose a proprietary Emisphere carrier known as 4-MOAC (and also known as E691) as the carrier they would try to use for oral PTH.  Tr. 832-33 (Lilly's Havel).  In January 1999, however, the PTH program ran into a problem.  Oncology studies of rats suggested that the injectable form of PTH might cause tumors.  Tr. 464-65.  The parties decided to halt the oral PTH program, at least temporarily.  See Ex. 612 at 0170.  The halt lasted about 18 months, and the injectable form of PTH eventually reached the market under the trade name Forteo.  During the halt, RCOA I expired by its own terms in February 1999, leaving the PTH License Agreement as the operative contract between the parties.

When the PTH research resumed in 2000, it produced promising results. On December 4, 2000, Emisphere and Lilly scientists jointly submitted for publication an article on "Oral Delivery of Biologically Active PTH."  Ex. 33.  The article discussed positive results in bone formation in experiments with rats and monkeys.  The research team had tested 100 Emisphere carriers with PTH and

found that 4-MOAC was most effective. With cool understatement, the researchers concluded: "To our knowledge, this is the first demonstration of the reproducible oral delivery of a biologically active protein drug in a randomized, controlled experiment in an animal model of human disease." Ex. 33 at 00025.

Effective June 8, 2000, the parties also agreed to RCOA II to govern continued research collaboration on oral delivery of PTH and hGH. RCOA II provided that, with certain exceptions, "Emisphere shall own all patents, patent applications and Know-How relating to the Emisphere Technology to the extent that Lilly and/or Emisphere invents and/or develops same during the course of and as part of the Programs, including, but not limited to, any Lilly Improvements." Ex. 4, § 1.5(b). Section 1.5(b) is limited to inventions or developments in the course of "the Programs," a defined term encompassing the joint research efforts.

RCOA II further provided: "Any new Carriers or inventions which are closely related to the Emisphere Technology (as it exists as of the Effective Date) that arise, in whole or in part, out of suggestions, recommendations or discussions held between Emisphere and Lilly scientists shall be Emisphere Technology." Ex. 4, § 1.5(c). Section 1.5(c) is not limited by its terms to new carriers and inventions generated in "the Programs," so this provision can apply more broadly to inventions generated in Lilly's secret independent research projects. Emisphere contends that Lilly has violated this provision by refusing to assign to Emisphere

-10-

the Lilly patent application for use of Emisphere carriers with GLP based on the secret Lilly research.  Emisphere contends that Lilly's research was based at least in part on the joint research on the carriers with PTH.

V.     *Lilly's Secret Research Projects on Emisphere Carriers*

Dr. Amin Khan was the lead Lilly representative on the joint committee that supervised the Emisphere-Lilly research efforts on oral PTH, having taken on that role beginning in 1998.  In January 2001, the parties began negotiating a much broader collaboration agreement, but the negotiations never came to fruition.

In January 2001, Dr. Khan also began recruiting talent inside Lilly to form a new and secret Oral Protein Delivery Team (the "OPD Team").  See Ex. 224.  The OPD Team was set up to study the mechanism of action of the Emisphere carriers, but with protein molecules other than PTH, which was the subject of the license from Emisphere and the joint research.  See Ex. 202.  At all relevant times, Dr. Khan remained the lead Lilly representative overseeing the joint Lilly-Emisphere research on oral PTH.  At all relevant times, Dr. Khan also supervised the secret Lilly OPD Team and its later evolution into what became the Oral GLP team whose research triggered this lawsuit.

Dr. Khan recruited Dr. Havel for the OPD Team in its earliest stages in January and February 2001.  See Exs. 207, 225, 226.  Dr. Havel had been working on the joint Emisphere-Lilly research from the beginning in 1997.  Dr.

Khan included Dr. Havel in the OPD Team because of his experience and knowledge gained through the work with Emisphere on PTH.  Tr. 493.  This point is not surprising, but it is important to note in light of Lilly's argument that the OPD Team derived no useful benefits from the PTH research.  The other members of the OPD Team had not been involved in the PTH research with Emisphere.

In the early stages of the OPD Team, in March and April 2001, Dr. Havel gave the team a detailed briefing on Emisphere's carrier technology and the results of the PTH research.  See Ex. 463 (slide presentation); Ex. 208 (April 20, 2001 minutes of OPD Team noting as "completed action item" adding the PTH presentation to team's database).  Some of this information was public, but clearly not all of it was.  The briefing included detailed information about results of unpublished research, experience with methods for synthesizing the carrier molecules, and methods for testing the carriers.  In fact, some of the slides Dr. Havel presented to the secret OPD Team even bore the legend:  "Confidential – Property of Emisphere Technologies, Inc."  Ex. 463 at 212, 219.

Dr. Khan instructed other OPD Team members to scour available published materials (patents, research papers, etc.) for information about Emisphere carriers.  Some of the materials addressed related technology developed by other companies, but the vast bulk dealt with Emisphere carriers.

While the OPD Team was proceeding, Dr. Khan and Dr. Havel also continued to work with Emisphere on the PTH project. Neither they nor other Lilly personnel informed Emisphere of the formation or work of the OPD Team. The most likely explanation is that (a) they had little confidence in Emisphere's ability to contribute to further progress, and (b) they hoped that the negotiations for a broader collaboration with Emisphere would be successful, so that they could secure a license to take their work further. At the same time, they were keeping the work secret so they could keep open the option of simply going forward even without a license if they concluded Lilly had the legal right to do so. Beginning in March or April 2001, the OPD Team included Lilly patent attorney Mike Bates to provide advice on how to carry out the research without violating the Emisphere contracts. See Tr. 492 (Lilly's Khan) and Ex. 509 ("We must work with Mike Bates to carefully plan and execute our strategy.").

Over the summer of 2001, negotiations with Emisphere toward a broader collaboration stalled. Lilly focused more sharply on legal concerns about the OPD Team's work. The team consulted with attorney Bates. Lilly has not waived the attorney-client privilege on this subject, but the evidence shows that in mid to late summer, several months after Bates joined the team, Lilly attempted to erect a so-called "firewall" between the PTH work with Emisphere and the OPD Team itself. Dr. Havel was removed from the OPD Team and was told not to discuss any research matters with members of the OPD Team. Dr. Khan, however, remained the team leader for both the PTH effort and the OPD Team. See Ex. 516 (July 23,

2001 e-mail with attachment).  Lilly contends this rather low firewall was created some time in June 2001.  Documentation of the firewall is surprisingly sketchy. Based on the documents with lists of team members and recipients, the court finds the firewall most likely was established in late July 2001.

At or about the time the firewall was established, Lilly decided to have the OPD Team shift from broad research to a focus on one particular protein, GLP. See Ex. 516; Ex. 212.  While Lilly makes much of the fact that Dr. Havel left the OPD Team before it actually began its research specifically on GLP, see Ex. 212 (August 2001), Dr. Khan remained the team leader.

There are three significant problems with the firewall.  First, the firewall was not erected until several months after Dr. Havel had joined the team and had provided a detailed report on Emisphere carriers and the PTH work.  As noted, that report included non-public information from the PTH project, and it even included information labeled as confidential Emisphere information.  Second, the firewall might have excluded Dr. Havel from the team for a while, but Dr. Khan still had a hands-on leadership role in both efforts.  Lilly has not offered any satisfactory reason why its contracts with Emisphere made it advisable to exclude Dr. Havel but to leave Dr. Khan in charge of both efforts.  Third, the exclusion of Dr. Havel is flatly inconsistent with Dr. Khan's and Dr. Havel's attempt at trial to portray the OPD Team, for the first time, as merely an extension of the joint PTH research program with Emisphere, such that the OPD Team's work would have

been authorized by the PTH License Agreement.  (The court finds the latter explanation incredible, as explained below, but the shifts and internal contradictions in Lilly's positions weaken its case.)

The GLP research produced promising results very quickly, by late October 2001.  The results were very positive for two carriers to deliver GLP, including the familiar Emisphere carrier 4-MOAC, which had been the focus of the PTH research.  See Ex. 503 (Oct. 25, 2001 e-mail from Khan to members of what had become the Oral GLP team).

VI.    *Lilly's GLP Patent Application and GLP License Negotiations*

After receiving these promising results from its secret research on Emisphere carriers, Lilly began negotiating with Emisphere in January 2002 for a license to commercialize products containing Emisphere's carriers and GLP.  Ex. 436 (Jan. 31, 2002 e-mail from Emisphere's Bender to Lilly's Zakrzewski).  Again, Lilly did not disclose to Emisphere its research efforts with GLP or the successful results.

While those negotiations were going on, Lilly filed a patent application with the World Intellectual Property Organization for combinations of GLP with 56 different delivery agents, including Emisphere's proprietary carriers that had been used in the collaborative research on PTH.  Lilly filed the application on February 20, 2002.  Ex. 39.  This was the application that was eventually

published in September 2003, prompting Emisphere to charge breach, which led to this lawsuit.  The application listed one inventor:  Dr. Amin Khan.

Lilly always recognized that it would need a license from Emisphere to develop the GLP research results into a commercial product using an Emisphere carrier.  Ex. 495 at 00256 (Khan e-mail of Feb. 22, 2002: "if we find a carrier that works it will be from the library of carriers we have generated from Emisphere publications and patents.  This will mean that in order to pursue oral FSH we will have to seek a license from Emisphere.").  As noted, the Lilly Oral GLP team was working with 4-MOAC as the carrier.  In fact, the Lilly Oral GLP team had even worked with a supply of 4-MOAC that Emisphere itself had provided to Lilly in the course of the collaborative research on PTH.  See Ex. 472; Tr. 588.  The Oral GLP team received approval from senior management to seek a license from Emisphere under an agreement that would have Lilly perform product development work using a carrier supplied by Emisphere.  Ex. 474.  Lilly has also claimed, however, that it did not need a license from Emisphere to continue its research on oral delivery of GLP using Emisphere carriers.  Ex. 482.[2]

---

[2]Emisphere has asserted patent infringement counterclaims against Lilly. Lilly has pled as an affirmative defense that its use was experimental.  Whether any form of the experimental use defense might apply to Lilly's activities is an issue that has not been tried.  It is not presented for decision at this time.  See generally *Madey v. Duke University*, 307 F.3d 1351, 1360-63 (Fed. Cir. 2002) (discussing experimental use defense to patent infringement).

During the negotiations, Lilly removed the firewall and allowed Dr. Havel to provide additional information to the GLP team.  See, *e.g.*, Ex. 474 (March 27, 2002 e-mail to "GLP-1 Oral Team" including both Dr. Havel and attorney Bates with update on approval for research to develop a product using 4-MOAC).  As another example, Exhibit 477 is a series of e-mails between Dr. Havel and Jill Olinger, a team leader on the Oral GLP project, on July 30 and 31, 2002.  Olinger was asking Dr. Havel and others for information on the reasons for the Oral GLP team's choice of a particular Emisphere carrier.  Her questions show that she had access to data from the PTH project, and Dr. Havel provided answers that obviously drew on his vast experience with that project.

The negotiations over a license for GLP eventually broke down in the late summer or fall of 2002 over intellectual property issues.  After Emisphere had worked with its lawyers to address Lilly's stated concerns about those issues, Lilly rejected the revised proposals.  Emisphere's lawyers presciently wondered just what Lilly had been up to for the last couple of years if it was not willing to agree to the revised terms.  See Ex. 494 (Emisphere's CEO Goldberg to Lilly's DiMarchi reporting that Emisphere lawyers had said "It really makes me wonder what they've done in the past year or two, and what they've actually been using your technology for.  This approach presents a challenge to your ability to protect your core technology.").  Lilly apparently then cancelled its GLP project in November 2002 because it could not commercialize the product without a license from

Emisphere.  See Ex. 501.  Lilly continued to work with Emisphere on a PTH product.

After the Lilly patent application for GLP was published on September 4, 2003, Emisphere executives were surprised, to put it mildly, to learn that Lilly had been working independently with Emisphere's carriers and GLP.  The parties have agreed that at least eight of the carriers in the Lilly patent application were claimed previously by Emisphere patents.  Tr. 238.  Two carriers in the Lilly patent application were carriers in Emisphere's unpublished database of carriers. Tr. 321-22.

After quick analysis of the patent application, Emisphere sent a letter on September 26, 2003 asserting that Lilly had violated the agreements.  Ex. 40. First, the Emisphere letter asserted that Lilly had violated RCOA II Section 1.5 by failing to assign the patent application to Emisphere.  Section 1.5(b) provided that "Emisphere shall own all patents, patent applications and Know-How relating to the Emisphere Technology to the extent that Lilly and/or Emisphere invents and/or develops . . . any Lilly Improvements."  A Lilly Improvement is defined as "an improvement to Emisphere's then-existing Emisphere Technology made by a Lilly employee as part of the Program."  Ex. 4, § 1.5(d).

The Emisphere letter also asserted that Lilly had violated Section 2.1 of the PTH License Agreement:  "Lilly shall not have any rights to use the Emisphere

-18-

Technology or Emisphere Program Technology other than insofar as they relate directly to the Field and are expressly granted herein." Emisphere asserted that Lilly violated this term by synthesizing and testing carriers disclosed and claimed in Emisphere patents and patent applications and PCT applications. Ex. 40. Emisphere asserted that the breaches were incurable, but as a basis for resolving the dispute, Emisphere demanded that Lilly assign the GLP patent application to it and disclose all patent applications relating to Emisphere technology that Lilly had filed or planned to file.

There is no evidence that Lilly communicated to Emisphere at any time before publication of the GLP patent application Lilly's belief that the PTH License Agreement allowed it to use Emisphere's carrier technology in fields outside of the PTH project. See Tr. 217, 224-26 (Emisphere's Bender). During the negotiations over a potential GLP license, Lewis Bender from Emisphere asked Dr. Khan about Lilly's plans for the technology once they agreed to a license. Dr. Khan got angry and had no answer. Tr. 224-25. Probably in the same meeting, Bender asked Dr. Khan whether he had worked with GLP, and Dr. Khan did not answer the question. Tr. 227. Dr. Khan testified that he considered the GLP work a Lilly trade secret that he was not free to disclose to Emisphere. Tr. 546-47.

Instead, while Lilly was carrying out its secret research project, Lilly's Dr. Khan was complaining to Emisphere CEO Dr. Michael Goldberg that Emisphere's lawyers apparently did not trust Lilly with confidential research results on

formulations and primate studies.  Dr. Khan wrote:  "Michael, I am left with the impression that your staff expect us to continue working blind, and I question their commitment to this program (of course, if I allow my imagination to run wild I can speculate as to the reason why)."  Ex. 38 (e-mail dated September 18, 2002). Dr. Khan believed that Emisphere was interested in working with Novartis on the PTH project.  Tr. 550-51.  Novartis had been working with Emisphere carriers on other proteins.  During the course of the research, Lilly, Novartis, and Emisphere had explored the possibility of a three-way collaboration on the carriers.  See Ex. 555 at 246.

VII.    *The Lawsuit and Later Events*

Emisphere's letter of September 26, 2003 was consistent with the parties' contractual provisions for dispute resolution, which called for notice, negotiations between senior management, and if litigation became necessary, for litigation in New York.  See PTH License Agreement § 17.1.  Lilly responded to the demand for negotiations by filing in this court a complaint for declaratory judgment on October 14, 2003.  Lilly delayed serving Emisphere, however, until December 2, 2003.  Emisphere agreed to Lilly's request for additional time to respond to the letter.  The parties began negotiating in December 2003.

Negotiations continued through the spring of 2004.  While they proceeded, Lilly continued to work on the PTH project, including a new clinical study in April 2004 with Emisphere carrier 4-MOAC.    Ex. 800.    During the settlement

-20-

negotiations, Emisphere proposed terms at various times that would not have involved termination of the agreements with Lilly.  The parties never reached an agreement.  Over the summer of 2004, Emisphere negotiated with Novartis to provide an exclusive license to Emisphere's carriers for use with PTH.  The deal was contingent on Emisphere's ability to terminate the PTH License Agreement with Lilly.  Ex. 326.  On August 23, 2004, two days before a scheduled settlement conference with the court, Novartis told Emisphere it was willing to go forward if Emisphere terminated the Lilly contracts.  That same day, Emisphere sent a letter to Lilly terminating RCOA II and the PTH License Agreement.  Ex. 44.

VIII.   *Breaches of the Contracts*

The parties' contracts provide that they are governed by New York law.  A party claiming breach of contract must show (1) formation of a contract; (2) performance by the party claiming breach; (3) the other party's failure to perform; and (4) resulting damage.  *Terwilliger v. Terwilliger*, 206 F.3d 240, 245-46 (2d Cir. 2000).  The parties agree that the contracts were formed.  Lilly did not contend at trial that Emisphere had failed to perform as required.  The issues are whether Lilly breached the contracts and, if so, whether the breaches were so damaging as to allow Emisphere to terminate the contracts.  Both questions require interpretation of the contracts.

In *Cruden v. Bank of New York*, 957 F.2d 961, 976 (2d Cir. 1992), the Second Circuit summarized the basic principles of contract interpretation under New York law:

> Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed. *See Breed v. Insurance Co. of North America*, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978). Construing an unambiguous contract provision is a function of the court, rather than a jury, and matters extrinsic to the agreement may not be considered when the intent of the parties can fairly be gleaned from the face of the instrument. *See Teitelbaum Holdings, Ltd. v. Gold*, 48 N.Y.2d 51, 56, 421 N.Y.S.2d 556, 396 N.E.2d 1029 (1979). A court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, *Fiore v. Fiore*, 46 N.Y.2d 971, 973, 415 N.Y.S.2d 826, 389 N.E.2d 138 (1979), nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case. *See DeVanzo v. Newark Ins. Co.*, 44 A.D.2d 39, 43, 353 N.Y.S.2d 29 (2d Dep't 1974), *aff'd*, 37 N.Y.2d 733, 374 N.Y.S.2d 619, 337 N.E.2d 131 (1975). Further, the entire contract must be considered, and all parts of it reconciled, if possible, in order to avoid an inconsistency. *See Laba v. Carey*, 29 N.Y.2d 302, 308, 327 N.Y.S.2d 613, 277 N.E.2d 641 (1971); *National Conversion Corp. v. Cedar Bldg. Corp.*, 23 N.Y.2d 621, 625, 298 N.Y.S.2d 499, 246 N.E.2d 351 (1969).

"A familiar and eminently sensible proposition of law is that, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." *W.W.W. Associates, Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990). In construing contractual language, "a court should accord that language its plain meaning giving due consideration to 'the surrounding circumstances [and] apparent purpose which the parties sought to accomplish.'" *Cable Science Corp. v. Rochdale Village, Inc.*, 920 F.2d 147, 151 (2d Cir. 1990), quoting *William C. Atwater & Co. v. Panama R.R. Co.*, 246 N.Y. 519, 524, 159 N.E. 418, 419 (1927). In addition, "[e]ffect and meaning must be given

to every term of the contract, and reasonable effort must be made to harmonize all of its terms. . . .  [T]he contract must be interpreted so as to give effect to, not nullify, its general or primary purpose."  *Reda v. Eastman Kodak Co.,* 649 N.Y.S.2d 555, 557 (N.Y. App. Div. 1996) (internal citations omitted).

A.   *RCOA II Section 1.5*

Lilly's continuing refusal to assign the GLP patent application to Emisphere violates Section 1.5(c) of the RCOA II agreement:

> It will not be Lilly's responsibility or intent to develop new synthetic chemical compounds that enable the delivery of therapeutic macromolecules and other compounds that are not currently deliverable by oral means or by certain non-oral means (the "Carriers") as part of the Programs.  Any new Carriers or inventions which are closely related to the Emisphere Technology (as it exists as of the Effective Date) that arise, in whole or in part, out of suggestions, recommendations or discussions held between Emisphere and Lilly scientists shall be Emisphere Technology.

Ex. 4, § 1.5(c).  The first sentence is a statement of intention by Lilly that is not legally binding.  The second sentence, however, is binding, and Lilly has breached it.

Parsing the elements of the second sentence, the GLP patent application for use of Emisphere's proprietary carrier with GLP claims new inventions that are closely related to Emisphere Technology as it existed on the effective date.  In the preamble, RCOA II defines "Emisphere Technology" broadly as:

> proprietary synthetic chemical compounds that enable the delivery of therapeutic macromolecules and other compounds that are not currently deliverable by oral means or by certain non-oral means (including all related patents, patent applications and Know-How presently owned by Emisphere and all patents, patent applications, and Know-How relating to inventions developed by Emisphere pursuant to the Program . . . ).

The effective date of RCOA II was June 8, 2000.

Emisphere has also shown that the Lilly patent application on use of GLP with Emisphere's proprietary carriers arose "in whole or in part, out of suggestions, recommendations or discussions held between Emisphere and Lilly scientists." Section 1.5(c) does not require Emisphere to show that the GLP patent application stemmed from "Confidential Information." Section 1.5(c) also does not require Emisphere to prove that its scientists suggested, recommended, or discussed with Lilly scientists the use of GLP in particular. Cf. Lilly Trial Br. at 16. Even so, both parties were always aware of the potential application of Emisphere's carrier technology to GLP, as shown by the fact that RCOA I gave Lilly a right of first refusal for a license to use Emisphere's carriers with GLP. See Ex. 1, § 3.1. Under Section 1.5(c) of RCOA II, Emisphere is required to show only that the invention arose in part out of suggestions, recommendations or discussions between Emisphere and Lilly scientists. Notwithstanding Lilly's denials and its efforts to insulate the GLP project from the preceding four years of work with Emisphere on carriers in general and 4-MOAC in particular, the following circumstances prove that Lilly breached Section 1.5(c) of RCOA II.

The first circumstance is Dr. Khan's dual role.  Dr. Khan is listed as the sole inventor of the GLP invention.[3]  He participated in selecting the carriers that would be tested with GLP.  Tr. 622.  When Dr. Khan participated in those selections, he was drawing on all knowledge available to him.  That knowledge included what he had learned in three years of supervising the Emisphere–Lilly PTH research, as well as in overseeing the work of the OPD Team, which was launched with a thorough briefing on Emisphere carriers by Dr. Havel, drawing on his own years of work on PTH with Emisphere scientists.

Dr. Khan testified that he and the OPD/GLP team relied only on published data and that none of the information from the Emisphere collaboration was useful in selecting carriers for GLP.  Tr. 623.  Dr. Khan may honestly believe that conclusion at this time, but it simply is not credible.  Dr. Khan acknowledged that the information he had gleaned from years of supervising the PTH research led him to have expectations about which carriers were likely to be most promising with GLP.  See, *e.g.*, Tr. 600-01.  Scores of exhibits show that he received a great deal of such information.  Some of his expectations turned out to be right and some wrong, but the background was obviously helpful.  For example, much of the GLP work had focused on 4-MOAC, the same carrier being used in the PTH work.

---

[3]After Lilly filed this lawsuit, it submitted documents to add two more members of the OPD/GLP Team as co-inventors.  Those two had not had any role in the PTH research with Emisphere.  The court expresses no view on how that change in the application fits in with patent law, but the change after this lawsuit was filed is entitled to no weight in terms of evaluating whether the claimed inventions arose at least in part from contacts with Emisphere scientists.

As Lilly was preparing to move forward to commercialize a GLP product, it chose to focus on 4-MOAC.  Dr. Havel testified that part of the reason was "that we had a fair amount of information on that particular molecule since we had been using it for PTH."  Tr. 857.  Dr. Havel explained in a later presentation, after the GLP patent application was filed, that the use of 4-MOAC offered advantages with GLP because of all the toxicology and human studies already conducted with 4-MOAC in the PTH research program.  Ex. 482 at 543 (Oct. 2002).  In addition, two of the carriers in the Lilly GLP patent application were carriers in Emisphere's database of unpublished carriers.  Dr. Khan also recalled that Emisphere CEO Dr. Goldberg had told him that Emisphere had conducted studies of carriers with GLP, though Dr. Khan did not recall specifics at trial.  Tr. 604.  Any work he did on carriers must have arisen at least in part from discussions, recommendations, and suggestions between Lilly and Emisphere scientists in the PTH project.  And his work led him to the inventions claimed in the GLP patent.

Dr. Havel's role is another important circumstance linking the Lilly GLP patent application to the PTH project, showing that the claimed inventions arose in whole or in part "out of suggestions, recommendations or discussions held between Emisphere and Lilly scientists."  In the first several months of the OPD Team's work, Dr. Havel's role was to educate the other members about Emisphere carriers in general and 4-MOAC in particular.  Dr. Havel had this educational role precisely so he could share the knowledge gained while working with Emisphere

for nearly four years on the PTH project with others who had not been part of that project. The OPD Team then evolved into the Oral GLP team later in 2001.

Dr. Havel had been involved in the PTH efforts from their earliest stages. See, *e.g.*, Ex. 91 at 144 (minutes of Nov. 30, 1998 meeting between Lilly and Emisphere discussing 4-MOAC work and noting Havel's role as "the communication link for general carrier technology"). As the OPD Team was being formed, months before the low firewall was erected in July 2001, he had disclosed data from the PTH project to the new secret OPD Team. He did so in order to ensure that they would have a better understanding of the mechanism of action of 4-MOAC. Tr. 886. Especially since no one clearly understood the mechanism of action, the better known a particular molecule was, the more of a head start the research team had. Documents from the earliest stages of the OPD Team show that the team was drawing on what Lilly had learned from the collaboration with Emisphere on PTH. See Exs. 225 & 226 at 002 (Feb. 26, 2001 e-mail citing "Emisphere, unpublished data" on hGH); Ex. 230 (Mar. 21, 2001 e-mail with OPD Team members discussing carrier structures and data from Dr. Havel and from Emisphere's Dr. Leone-Bay); Ex. 202 (Khan e-mail to McGill with structure of free acid form of 4-MOAC on March 9, 2001, noting "This is the carrier being used for the oral PTH program.").

On March 8, 2001, Dr. Havel attended a meeting with Emisphere scientists noting that a list of useful excipients (the non-active ingredients in a drug

formulation that can be critical to its safety and effectiveness) would be prepared, and that the list would be "based on Emisphere's experience with other carriers and molecules." Ex. 462.

Approximately a week later, Dr. Havel made a detailed presentation to Lilly management about oral protein delivery in general, drawing on extensive materials from the collaboration with Emisphere, including research data from other projects looking at other proteins. Some of the information Dr. Havel presented was actually still labeled "Confidential – Property of Emisphere Technologies, Inc." See Ex. 463, including pages 0212, 0219 *et seq.* Dr. Havel's report included results on Emisphere carriers with other proteins, not limited to PTH.[4] See also Ex. 203 (Havel e-mail on March 20, 2001 with attachments on PTH results for presentation to OPD team, including list of which carriers worked best with PTH and hGH). Dr. Havel's information became part of the database the OPD Team used for its research. Ex. 208; Tr. 738-40.

All of this sharing of information from the PTH collaboration, including confidential Emisphere information, occurred several months before the low firewall was established to exclude Dr. Havel (but not Dr. Khan) from further involvement in OPD and/or GLP research. The court has already noted the

---

[4]Lilly has argued that some of this information had been published by Emisphere in a presentation at a public meeting. See Ex. 170. The weight of the evidence shows that Emisphere had not published this information that Havel was sharing inside Lilly to secure support for the broader and secret OPD Team.

problems with the firewall effort.  Before the firewall was established, with all its shortcomings, Lilly had hoped to negotiate a deal with Emisphere that would license all of these potential uses.  But Lilly was developing a fall-back plan in case negotiations were unsuccessful, as they turned out to be.  The meeting summary for March 20, 2001 states: "In the event these negotiations fail, we are prepared to develop our own expertise within Lilly. [Emisphere's intellectual property] position is being evaluated and a strategy will be developed . . . ." Actions items included an attempt to identify as much public information on Emisphere's carriers as possible.  Dr. Havel was still designated to act as the link to the GLP team.  Ex. 229.

On April 19, 2001, Dr. Khan reported to the OPD Team that negotiations with Emisphere for a broad agreement were not going well, so that the OPD Team would need to work with Lilly attorney Mike Bates "to carefully plan and execute our strategy."  Ex. 509.  The strategy for dealing with Emisphere's intellectual property rights would eventually include the firewall between the PTH team and the other research effort.  See, *e.g.*, Ex. 212 (August 2, 2001 meeting minutes for OPD Team that no longer included PTH team members other than Dr. Khan, who remained involved in both).  But even by April 2001, of course, Dr. Havel and Dr. Khan, who had worked closely with Emisphere on the PTH project, had already conveyed a great deal of information to the others working on the OPD Team.  Dr. Havel continued to attend OPD Team meetings as late as June 21, 2001.  See Ex. 236.  Even into the latter half of July 2001, Dr. Havel and Dr. Kuchibhotla from

the PTH effort were listed as members of the OPD Team, and Dr. Khan was sharing PTH information with the OPD team.  See Ex. 516, including pages 447, 449, 455.

Lilly witnesses and documents show that Lilly was concerned about a future charge that it had used Emisphere's confidential information in the OPD and later GLP projects.  Accordingly, with an initial boost from the PTH team that had worked with Emisphere, the OPD Team scoured the public record for patents and publications about Emisphere's carriers that it could use as its foundation for research.  See, *e.g.*, Ex. 229.

This firewall effort and the search of public records pose several additional problems for Lilly in this lawsuit.  First, they emphasize that Lilly managers were very much aware of potential problems with Emisphere resulting from this secret and supposedly independent research project.  Second, Section 1.5(c) of RCOA II is not limited to confidential information.  The broad provision recognizes the practical reality that the scientists from the two companies would share a great deal of information that might or might not qualify as strictly confidential, but that would be practical and useful in inventing new carriers and other related improvements.

Third, Emisphere has shown that the Oral GLP team did not rely solely on published information, but had already received a running start on carrier

-30-

research because of the help they received from Dr. Khan and Dr. Havel, who got their start with the Emisphere-Lilly collaboration on PTH.  In other words, Lilly's Oral GLP team already knew a lot about what had worked with the PTH research. The effort to develop a sanitized paper trail relying on only published information did not accurately reflect the reality of what had occurred, yet it reflects an awareness of the benefits of making the project appear to be based on only public information.

Fourth, Lilly argued at trial that the OPD Team was part of the collaborative PTH Program being carried out with Emisphere, so that the transfer of information from Dr. Havel and Dr. Khan was not a breach of the contracts and did not help with the GLP effort.  The theory seems to be that Lilly would be responsible for obtaining FDA approval for any successful oral PTH product, and that the FDA might be troubled if Lilly were not in a position to provide an accurate description of the carrier's mechanism of action.  This explanation for the OPD Team has some superficial plausibility, and no doubt Lilly had such concerns.   The explanation for the OPD Team's work does not stand up to scrutiny, however.

This explanation was first offered at trial, and it is not supported by contemporaneous documents or other evidence.  In fact, the explanation has weakened Lilly's credibility in this case overall.  If the new explanation had been the real motive for the OPD Team work, there would have been no reason not to tell Emisphere, no reason not to seek help from Emisphere, and no reason not to

ask Emisphere about its own prior dealings with the FDA concerning its carriers. See Tr. 577 (Khan testimony that work of OPD Team was "not a part of the program between Lilly and Emisphere," so there was no reason to include Emisphere). If the new explanation had been the real motive for the OPD Team work, there also would have been no reason to bring in a separate group of scientists and to have them attempt to develop a paper trail that suggested reliance on only published information. And if the new explanation had been the real motive for the OPD Team work, there also would have been no reason for the team not to share its results with the Lilly scientists working with Emisphere on PTH. See Tr. 732-33 (Dr. McGill of OPD Team did not know of such distribution). Dr. Havel said that he also had not heard of any such disclosures.

For all of these reasons, the court finds by a preponderance of the evidence that Lilly's claimed GLP inventions arose at least in part from suggestions, recommendations, and discussions with Emisphere scientists. Lilly's refusal to assign to Emisphere the oral GLP patent application (Exhibit 39) was and continues to be a breach of Section 1.5(c) of the RCOA II agreement.[5]

_____

[5]Emisphere's original protest letter of September 26, 2003 focused on Section 1.5(b) of the RCOA II, which gives Emisphere ownership of "Lilly Improvements." The contract defines "Lilly Improvements" to include "an improvement to Emisphere's then-existing Emisphere Technology made by a Lilly employee as part of the Program." The "Programs" are defined as the joint research on PTH and hGH. Ex. 4, § 1.1. Based on the evidence at trial, the court finds that the Lilly OPD Team and Oral GLP research were not part of the PTH Program. If the court were wrong on that score, however, then Emisphere would still be entitled to ownership of the oral GLP patent application under Section 1.5(b).

B.     *PTH License Agreement Section 2.1*

Lilly's entire OPD Team and the Oral GLP project also violated Section 2.1 of the PTH License Agreement, which was in full force at the relevant times.  In Section 2.1 of the PTH License Agreement, Emisphere granted Lilly an exclusive license to use Emisphere information for the "Field," which was defined as oral delivery of PTH.  Ex. 2.  Section 2.1 concludes:  "Lilly shall not have any rights to use the Emisphere Technology or Emisphere Program Technology other than insofar as they relate directly to the Field and are expressly granted herein."  By its plain terms, this provision bars Lilly from using Emisphere Technology and Emisphere Program Technology outside the agreed field of PTH research.  Nothing in the language limits its effect to information deemed "confidential" under the agreement.

From Emisphere's perspective, this restriction on use of its technology in other fields was critical.  Emisphere's business is its carrier technology.  It needs to collaborate with larger pharmaceutical companies like Lilly to develop the carrier technology for therapeutic use on a commercial scale.  Rather than staking its entire business on one partnership with one large company, Emisphere chose a strategy of working with different partners with exclusive but limited license arrangements to develop carriers suitable for particular therapeutic proteins.

The research efforts for any one therapy could easily require Emisphere to disclose to its research partner a vast amount of valuable information about the

Emisphere carriers, as in the PTH project with Lilly.  Much of that information was not public, such as the best procedures for synthesizing and manufacturing particular carriers, how to deal with impurities in the carriers, which excipients were likely to work well or not so well with carriers, toxicology data, dose response data from animal experiments, and whether solid or liquid doses produced better absorption, among many others.  If a partner with vast scientific, intellectual, and commercial resources like Lilly could take the information gleaned in one project and use it in an independent project with other therapeutic proteins, Emisphere would have effectively sold its entire business for the relatively cheap price of a license for only one application of its technology.  In addition, Emisphere's existing licenses to its other research partners working on other proteins would weaken and lose value, and Emisphere's ability to enter into new exclusive licensing agreements would also be diminished.[6]

Lilly's theory is that the key sentence – "Lilly shall not have any rights to use the Emisphere Technology or Emisphere Program Technology other than insofar as they relate directly to the Field and are expressly granted herein" – merely precludes any implied license rights beyond those expressly stated.  Under this theory, the PTH License Agreement left Lilly free to use Emisphere's technology in any way not expressly prohibited by the agreements, including research use on Emisphere's carriers for delivering other proteins.  Under this theory, if Emisphere

---

[6]These circumstances, along with Lilly's substantial investments thus far in the oral PTH research, help explain why settlement negotiations have not been successful in this case.

-34-

is unhappy about Lilly's secret research projects on Emisphere carriers, its legal remedies are limited to claims for patent infringement.

Lilly compares the sentence to the provision in Section 11.1 of the same PTH License Agreement, where the parties agreed: "Any Confidential Information revealed by a Party to another Party shall be used by the receiving Party exclusively for the purposes of fulfilling the receiving Party's obligations under this Agreement." Ex. 2, § 11.1. Lilly contends this provision imposes affirmative restrictions on its use of confidential information, while the sentence in Section 2.1 is more limited in effect. Lilly also suggests that Emisphere's interpretation of Section 2.1 makes the non-use promise in Section 11.1 redundant, which is a reading to be avoided. See *Ronnen v. Ajax Electric Motor Corp.*, 671 N.E.2d 534, 536 (N.Y. 1996); *Muzak Corp. v. Hotel Taft Corp.*, 133 N.E.2d 688, 690 (N.Y. 1956).

Lilly points out that the sentence appears in the grant of the license and does not use the verb "covenant" to provide an explicit covenant not to make competing uses of Emisphere's technology. Nevertheless, the plain language of the sentence easily supports Emisphere's reading. It does not use the verb "covenant," but its prohibition is not limited to rights that might arise under the contract. It does not say, in effect, "Lilly shall not have any rights *under this agreement* to use the Emisphere Technology or Emisphere Program Technology other than insofar as they relate directly to the Field and are expressly granted herein." It says more simply that "Lilly shall not have *any* rights [*i.e.*, from *any*

source] to use the Emisphere Technology or Emisphere Program Technology . . . ." That understanding fits with the business realities and the entire context of the agreement. Without that understanding, Emisphere was taking the chance that Lilly could acquire the entire value of the company's technology for the price of a license limited to just one possible application of it.

Lilly's arguments against this reading are not persuasive. First, Emisphere's interpretation does not render Section 2.1 and Section 11.1 redundant. Section 11.1 applies to the "Confidential Information" of both parties. It requires that a receiving party use the other party's confidential information "exclusively for the purposes of fulfilling the receiving Party's obligations under this Agreement." Section 2.1 applies more broadly to "Emisphere Technology" and "Emisphere Program Technology," and provides that Lilly shall not have any rights to use them "other than insofar as they relate directly to the Field [oral delivery of PTH] and are expressly granted herein." There may well be considerable overlap under Emisphere's interpretation, but there are differences in scope. Also, it is not unusual to protect the same interests in two different ways in a contract, such as one focusing on confidential information and the other more broadly on all the information being provided.

Lilly also relies on an event in the failed 2002 negotiations over a license to use Emisphere carriers to deliver GLP orally. In May 2002, Emisphere proposed, and Lilly rejected, even more explicit language in which Lilly would "covenant" not

to use the Emisphere technology except as part of the broader "Field." Ex. 68 at 002064. Emisphere was working with a new law firm in those 2002 negotiations. Emisphere and its new lawyers proposed an explicit covenant not to use unlicensed technology and a provision that Lilly would work exclusively with Emisphere on oral delivery of proteins. Ex. 68.[7]

Lilly's reliance on the language proposed by Emisphere in 2002 is not persuasive. Those negotiations occurred more than five years after the parties negotiated and agreed upon the language of Section 2.1 in the PTH License Agreement. The language proposed in the 2002 negotiations also came from new lawyers who had not been involved in any of the prior drafting or negotiations between the parties. The language proposed in 2002 therefore sheds no useful light on the parties' intentions in 1997. While the proposed language used the more explicit verb "covenant," that is not the only plain or sufficient way to express the idea that, if Emisphere opened its laboratories, files, and brains to

---

[7]Emisphere proposed this language, with underscores to show additions to and strike-outs to show deletions from Lilly's proposed language:

> 3.2    Ownership; No Implied Licenses; Covenants. As between the Parties, all rights of ownership with respect to the Emisphere Technology shall at all times remain solely with Emisphere unless otherwise specified in this Agreement. Lilly shall not have any rights to use the Emisphere Technology other than insofar as they relate directly to the Field and are expressly granted herein. set forth herein.  Lilly covenants that it shall not practice the Emisphere Technology, or Joint Patent or Joint Know [sic] that is owned solely by Emisphere, outside the scope of or other than in accordance with the licenses set forth in Section 3.1.

Ex. 68 at 2064. Lilly focuses on the last sentence with the explicit covenant not to practice the Emisphere Technology outside the scope of the proposed licenses.

enable PTH research, Lilly would have to agree not to do competing research with Emisphere's own carriers and technology in other fields.

Third, Lilly also tries to support its argument with a citation to a treatise on patent licensing transactions, Einhorn, Patent Licensing Transactions § 1.03[1], at 1-36, n.19 (2004). The author notes in his principal text that a license for a compound containing a chemical made by the licensor's patented process, but which can be obtained elsewhere, might be interpreted as containing an implied license to make the chemical, so that the drafters of the license should rebut such an implication. The note cited by Lilly states: "A suitable provision to rebut the implication of a license is: 'The license herein granted to manufacture, use, and sell the licensed composition does not include the right to manufacture, use, or sell any compound separately covered by Licensor's patents.'"

The point does not support Lilly. The author's suggested language ties the limitations directly to the license: "The license herein granted . . . does not include . . . ." Section 2.1 of the PTH License Agreement, by contrast, does not contain any such limits. It says more broadly: "Lilly shall not have any rights to use" Emisphere's technology "other than insofar as they relate directly to the Field and are expressly granted herein." It does not say "Lilly shall not have any rights *under this agreement* to use" Emisphere's technology, but that Lilly shall not have *any* rights – period – to use Emisphere's technology.

In fact, the Einhorn treatise actually lends strong support for Emisphere's position here.  A few pages later in Section 1.03[4] on "Implied Negative Covenant," the author writes:

> Some licenses are drafted so that the granting clause is not coextensive with the full scope of the patent (e.g., quantity, field of use, or territorial limitations).  Should the activities of the licensee exceed the ambit of the limited grant, the question arises as to whether the licensee had breached an implied covenant not to invade the ungranted part of the patent.
>
> Some courts have held that there is such an implied negative covenant in these circumstances and have found a breach of contract.  The appropriate remedy would then be for damages or specific performance, although one judge has ordered a forfeiture of the license.  (This is contrary to the general rule that forfeitures are not favored.)
>
> Other courts, however, have refused to find an implied covenant, and have in effect limited the licensor's remedy to a suit for infringement.  In a related Supreme Court case, it has been held that a licensee who sells outside of the licensed field of use is an infringer.  Furthermore, the purchaser who took the goods with notice of the restriction, and used them outside of the licensed field was also an infringer.
>
> While each case must be analyzed in terms of its own specific facts and circumstances, it would appear that the second group sounds the better rule.  This follows from the fact that a straight patent license is essentially a promise by the licensor to forbear from bringing suit so long as the licensee operates within the terms of the grant.  Should the licensee transcend the terms of the grant, the licensor has an adequate remedy in a suit for infringement.

Einhorn, Patent Licensing Transactions § 1.03[4] (footnotes omitted).  So far, so good for Lilly.  The quoted discussion reflects support for its claim that a remedy should be limited to patent infringement rather than also including breach of contract.  The cases cited in support of Lilly's position, however, addressed

contracts without language comparable to its preferred interpretation of Section 2.1.[8]

But Einhorn then turns to the situation presented here, and argues for the opposite conclusion, a claim for breach of contract:

> However, should the license be based upon a grant of technical information, then the balance tips in the opposite direction. Here the licensor has granted more than a mere forbearance from suit. He has actually delivered a package of valuable information to the licensee. Should the licensee exceed the terms of the grant, the sole appropriate remedy is a suit for breach of contract based on an implied covenant not to do so.

*Id.* That paragraph describes the parties' relationship in this case. Emisphere granted much more than a patent license. It agreed to a close and collaborative research relationship in which it would provide Lilly with a vast quantity of technical information, both public and confidential, only some of which might be protected by patent law. Emisphere delivered to Lilly "a package of valuable information." Under Einhorn's reasoning, the court should find an implied covenant not to use that information outside the scope of the license – even without the statement that "Lilly shall have no rights to use" Emisphere's

---

[8]See *Florida Canada Corp. v. Union Carbide & Carbon Corp.*, 280 F.2d 193, 195 (6th Cir. 1960) (contract contained no express prohibition on use of patented process at plants other than that covered by contract, and contract specifically stated there could be no implied agreement not to use trade secrets at other plants); *Eli Lilly & Co. v. Genentech, Inc.*, 17 U.S.P.Q.2d 1531, 1990 WL 305392 (S.D. Ind. July 17, 1990) (contract contained no language comparable to that here in § 2.1); *B&J Mfg. Co. v. Hennessy Industries, Inc.*, 194 U.S.P.Q. 496, 1976 WL 21072 (N.D. Ill. Oct. 19, 1976) (Flaum, J.) (collecting cases; contract contained no express prohibition).

technology outside the PTH field.  With that sentence, the conclusion in favor of
Emisphere becomes even more secure.

The conclusion draws further support from *Shaw v. E.I. DuPont de
Nemours & Co.*, 226 A.2d 903, 905-07, 909 (Vt. 1967), which affirmed a damage
award for breach of an implied covenant not to use a patent beyond the scope of
license.  The patent holder granted a license to manufacture, use, and sell
filaments with a maximum cross-sectional dimension of not more than 0.005
inches.  The defendant-licensee manufactured and sold filaments with a larger
cross-section, thus exceeding the scope of the license.

The court held that the patent holder was not limited to a federal lawsuit for
infringement but could also assert a claim for breach of contract.  The court also
had no difficulty implying a covenant not to exceed the scope of the license.  "The
underlying principle is that there is an implied covenant that neither party shall
do anything to injury or destroy the rights of the other party to receive the benefits
of the agreement."  *Id.* at 906.  The principle had been applied in copyright license
agreements, and the court found "there is a corollary application in a restricted
license of patent rights to the effect that the licensee will not invade the ungranted
part of the patent to the detriment of the estate reserved by the licensor."  *Id.*  "The
implication that the defendant is not to exceed the limits of his license is not
external to the license agreement.  It is an inference which follows from the

language of the parties and becomes as much a part of the contract as if it were spelled out in explicit terms." *Id.* On rehearing, the court stood by this view:

> When permission is granted to operate in a restricted area, the acceptance of the privilege implies a condition that the area reserved will not be invaded. An English judge has observed, – 'This seems to be common sense and not to depend upon any patent law or any other particular law.' *Incandescent Gas Light Co. v. Cantelo*, 12 Rep. Pat. Cas. 262, (Opinion by Mr. Justice Wills, quoted with approval in *Henry v. A.B. Dick Co.*, 224 U.S. 1, 32 S. Ct. 364, 56 L.Ed. 645, 661).

226 A.2d at 909. The cases cited above in footnote 8 would weigh on the other side of this question of course, but only if the key sentence in Section 2.1 were not included, and only if Emisphere had not also agreed to provide Lilly so much valuable technical information, including confidential information, about the details of its technology.

Lilly has admitted that it made experimental use of the Emisphere carriers 4-MOAC and 5-CNAC with insulins, human growth hormone, interferon, follicle stimulating hormone, and salmon calcitonin. Ex. 223 (Lilly interrogatory answer). Lilly points out that it conducted these experiments only after the chemical structures of those carriers and the methods of manufacturing them were publicly disclosed in patents or other publications. *Id.* This latter qualification does not matter under Section 2.1. Section 2.1 is not limited to use of confidential information. It applies to all of the Emisphere technology. Section 2.1 also does not require Emisphere to prove that particular pieces of information were used. Such proof can be both expensive and difficult in this type of case, where there

were extensive, informal, and undocumented contacts in the collaboration between the parties over several years. Instead, Section 2.1 provides broad protection by saying that the price of such open access to Emisphere's technology is a promise not to use that technology outside the agreed collaborative effort. That is a reasonable provision, especially in light of the difficulties of more specific proof of use.

Lilly contends that under Emisphere's theory, Lilly would be prohibited from carrying out research that any other company in the world may carry out. That is correct but not surprising. No other company in the world had the kind of access to Emisphere's technology that Lilly had, at least not without agreeing to similar restrictions on use of Emisphere technology outside the designated field in the license.

In this respect, this case is comparable to *Medinol Ltd. v. Boston Scientific Corp.*, 346 F. Supp. 2d 575 (S.D.N.Y. 2004). In *Medinol*, the parties had entered into "a close and extensive contractual relationship" for research, development, manufacture, and distribution of stents for medical uses. *Id.* at 581. Medinol's primary role was to manufacture the stents. Boston Scientific was to sell them in the United States. Medinol granted a license for such sales of its patented stents.

Boston Scientific was concerned about the risk of supply disruptions with Medinol's production lines. The parties agreed that Medinol would establish a so-

-43-

called "Alternative Line" for manufacturing stents, which Boston Scientific would be permitted to operate. Medinol granted Boston Scientific a license for the right to manufacture stents, but that license was limited to "the operation of the Alternative Line." *Id.* at 597. Boston Scientific then set up a secret manufacturing operation outside the scope of the Alternative Line. Although there was no express covenant against such manufacture, the court found that the parties' close relationship and careful drafting showed that the unauthorized manufacturing amounted to a breach of contract, *id.* at 598, without limiting Medinol to a patent infringement suit. The court further found that Boston Scientific's stealth and secrecy showed it had acted in bad faith by setting up the unauthorized line. *Id.* at 596. The court granted summary judgment for Medinol on liability for the breach, leaving only the issue of damages for trial.

Similarly here, the parties agreed to a cooperative venture, but with important limits. When Lilly ventured beyond those limits with its secret research projects, it did not risk only a claim of patent infringement. It also breached the contract that gave it the limited license in the first place. Accordingly, Lilly's work on the secret research projects, first the OPD Team and then its transition to the Oral GLP research, was outside the scope of the agreed Field of oral delivery of PTH and violated Section 2.1 of the PTH License Agreement.

-44-

C.    *PTH License Agreement Section 11.2*

Emisphere has also shown that Lilly breached Section 11.2 of the PTH License Agreement, which provides:

> 11.2  Each Party agrees to disclose Confidential Information of another Party only to those employees, representatives and agents requiring knowledge thereof in connection with their duties directly related to the fulfilling of the Party's obligations under this Agreement. * * *

The PTH License Agreement defines "Confidential Information" in Section 11.1, immediately preceding:

> The Parties acknowledge that it may be necessary, from time to time, to disclose to each other confidential and proprietary information, including without limitation, inventions, works of authorship, trade secrets, specifications, designs, data, know-how and other information, relating to the Field, the Compounds, the Carriers, the Products, processes, and services of the disclosing Party or regarding the Emisphere Technology or Emisphere Program Technology or the Lilly Technology or the Lilly Program Technology.  The foregoing shall be referred to collectively as "Confidential Information".

The definition is obviously broad, including the general know-how that Emisphere scientists had obtained by years of working with various carriers.  The definition is subject to exceptions in Section 11.3 for several categories of information that the receiving party did not obtain from the other party to the contract.

The evidence here shows by a preponderance of the evidence that Lilly employees engaged in the joint oral PTH research project conveyed confidential Emisphere information to other Lilly employees who did not require such

knowledge for purposes of fulfilling Lilly's duties under the agreements with Emisphere.  That information was provided so that the other Lilly employees working on the secret Lilly projects would have a better understanding of the carriers and their mechanism of action.  Tr. 886 (Havel).

One of the clearest examples of such disclosure in breach of Section 11.2 was Dr. Havel's presentation to the OPD Team in March 2001.  As noted, some of the slides from that presentation are clearly marked as confidential Emisphere information.  See Ex. 463 at 212, 219.  Dr. Havel testified that he thought he was authorized to distribute such information to others within Lilly.  Tr. 869-70.  That testimony shows only that one of the key scientists involved in the PTH project did not understand one of the important contractual terms to protect Emisphere's interests.  He simply was not authorized to share that information outside the PTH research team.  In fact, he made no effort to ensure that the information he was presenting would not include confidential Emisphere information (which makes it difficult to credit Lilly's attempts at trial to suggest that the information marked as confidential was no longer confidential at that time).  The March 2001 presentation to the OPD Team was a breach of Section 11.2.

After the firewall was removed in 2002, Dr. Havel made another detailed presentation to the Oral GLP team in April about the work done with PTH.  Ex. 499.  Again, he made no effort to ensure that information he was presenting would not include confidential Emisphere information.  Tr. 879.  In fact, this

presentation also included slides labeled as Emisphere confidential information, Ex. 499 at 595-96 & 623, and acknowledged the contributions of Emisphere scientists.  Ex. 499 at 625.

Dr. Havel provided confidential PTH information to the GLP team at other times.  See Ex. 477; Tr. 880-81.  The use of 4-MOAC in the secret Lilly GLP project was based in substantial part on the information gleaned from the PTH work with Emisphere.  See Ex. 482 at 543; Tr. 883-84.

All of this evidence shows that Lilly breached Section 11.2 of the PTH License Agreement by sharing confidential Emisphere information with the OPD Team and the GLP team within Lilly, which were pursuing the research intended to bypass Emisphere.

D.   *Conflicting Provisions?*

Lilly argues that the confidentiality provisions of the PTH License Agreement and RCOA I conflict with one another and that, by their terms, the original RCOA I controlled the issue until that agreement expired by its terms in February 1999. See Ex. 2, § 20.5.   The argument seems to be aimed at erecting an insurmountable requirement for proof, one that would require Emisphere to prove when various bits of information were communicated to Lilly.  Lilly's theory seems to be that only confidential information received by Lilly *after* February 1999 in connection with the PTH research is governed by the PTH License Agreement.

The argument fails on several levels.  First, the confidentiality provisions of RCOA I and the PTH License Agreement simply did not conflict.  The RCOA I provisions required Lilly as a whole to keep information confidential but did not restrict internal distribution or use of Emisphere's confidential information within Lilly.  Ex. 1, § 5.1.  The PTH License Agreement includes tighter restrictions, especially on disclosure of information to Lilly employees who are not involved in the Emisphere–Lilly PTH project, as well as on use of Emisphere information outside the PTH field.  Ex. 2, §§ 11.1–11.3 and 2.1.  In other words, the PTH License Agreement forbids some internal disclosures and uses that were permissible when RCOA I was the only operative agreement.  But Lilly has not shown that either contract *requires* either party to take actions that the other contract forbids.  The tighter provisions in the PTH License Agreement do not actually conflict with any of the RCOA I provisions.  They merely supplement the RCOA I provisions, just as state law supplements (and does not conflict with) federal law when state law prohibits conduct that federal law does not prohibit.

Second, Lilly also contends that because the PTH License Agreement did not take effect until April 1998, Emisphere cannot prove a violation of Section 11.2 unless it can prove that any confidential Emisphere information that was shared with others at Lilly was received by Lilly after the PTH License Agreement took effect (or perhaps after RCOA I expired).  Under this theory, because the original RCOA I did not impose limits on internal distribution of confidential information within Lilly, Section 11.2 of the PTH License Agreement did not apply to

confidential information that Lilly had received earlier.  The argument has no support in the text of Section 11.2 or elsewhere in the contracts.  The simplest and most plausible interpretation of Section 11.2 is that after its effective date, any disclosures of Emisphere's confidential information within Lilly must be limited to those needed for Lilly to fulfill its obligations under the contract.  There is no attempt in the language of the contract to restrict only disclosures or uses of information transferred in the future.  Emisphere has proved the breaches of the contracts identified above.

IX.     *Emisphere's Right to Terminate*

      A.        *Material and Incurable Breaches*

Lilly contends that any breach of contract caused no harm to Emisphere and therefore should be deemed immaterial and thus not sufficient to support termination.  Lilly also contends that it is entitled to notice and an opportunity to cure any breaches.  The arguments are not persuasive.

First, Emisphere has given ample notice of its belief that Lilly breached the agreements, and its notices have been specific.  Lilly has not cured the breaches but has instead litigated vigorously the issue of breach.  Lilly is not entitled to litigate the matter to conclusion and only then, after losing (in the trial court? the appellate court? the Supreme Court?) to first attempt to cure the breaches.  Lilly

could choose between litigation and attempting a cure.  It made its choice no later than when it filed this lawsuit in October 2003.

Second, in the court's view, all three of the proven breaches amount to incurable breaches, both independently and together.  Witnesses and documents from both parties recognized that the research collaboration between the parties requires a high degree of candor and trust in both directions.  The court fully agrees.  Emisphere understandably and justifiably feels it can no longer trust Lilly to protect the confidentiality of Emisphere's most valuable intellectual property and to work as part of a team.  Lilly, in breach of its promises to Emisphere, actively concealed for several years the fact that the same people overseeing the collaborative effort for Lilly were also leading (Dr. Khan) and aiding (Dr. Havel) a parallel but secret project within Lilly that did not include Emisphere at all.  That project was intended to bypass the need to work with Emisphere.  There is no indication that Lilly could do anything to restore the needed level of trust.  Moreover, the fact that each side was disparaging the scientific and business acumen of the other during the trial helps convince the court that this relationship has suffered an irretrievable breakdown.

Emisphere has not pointed to specific, substantial monetary harm it has suffered at this point.  Lilly has not moved forward to commercialize its GLP inventions; it stopped the research and development effort after the license negotiations with Emisphere reached an impasse.  The harm to trust and

confidence, however, had already been done.  That breach is irreparable.  Also, one must recall that the principal reason the license negotiations broke down was disagreement on ownership and protection of intellectual property rights.

Under New York law, Emisphere's right to terminate the contracts depends on whether the breaches went "to the root of the agreement between the parties." *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997); *Wechsler v. Hunt Health Systems, Ltd.*, 198 F. Supp. 2d 508, 526 (S.D.N.Y. 2002). New York law imposes on parties to contracts an implied covenant of good faith and fair dealing.  *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co.*, 281 N.E.2d 142, 144 (N.Y. 1972).  A breach of that covenant can support termination.  *American Assurance Underwriters Group, Inc. v. MetLife General Ins. Agency, Inc.*, 552 N.Y.S.2d 259, 261 (N.Y. App. Div. 1990).  That describes this case.  By pursuing its secret and independent research projects with Emisphere's carriers, Lilly did not act in good faith and did not deal fairly with Emisphere.  The breach of trust went to the root of the parties' agreement, and it is serious enough to support termination of the contracts.  *E.g.*, *Medinol Ltd. v. Boston Scientific Corp.*, 346 F. Supp. 2d at 596-98 (granting summary judgment for Medinol finding that Boston Scientific breached contract and acted in bad faith by establishing secret, unlicensed manufacturing facility).

B.    *Election of Remedies, Waiver, and Rule 408*

Lilly also contends that even if it breached the agreements, and even if the breaches would have entitled Emisphere to terminate, Emisphere lost its right to terminate by failing to do so immediately and instead continuing to work with Lilly under the contract while the parties negotiated a possible agreed settlement of Emisphere's claims of breach.  Lilly contends that Emisphere elected a different remedy and gave up its right to terminate.[9]

Under the doctrine of election of remedies, the victim of a material breach of contract must choose between two remedies.  It can elect to terminate the contract and recover money damages resulting from the breach and termination, or it can continue the contract and recover damages limited to those resulting from the breach.  *E.g.*, *ESPN, Inc. v. Office of Commissioner of Baseball*, 76 F. Supp. 2d 383, 387 (S.D.N.Y. 1999) (applying New York law).  Once a party makes its choice and continues the contract, it cannot later go back and claim a right to terminate based on that breach, though it may retain the right to terminate for later breaches.  *Id.* at 387-88, citing *Apex Pool Equipment Corp. v. Lee*, 419 F.2d

─────────────────

[9]Lilly first raised the defense of waiver in its December 14, 2004 response to Emisphere's counterclaims.  At trial, Lilly shifted ground again and said that it was actually relying not on waiver but instead on the doctrine of election of remedies.  See Tr. 1025.  Emisphere objected to both the late notice of the waiver defense and the even later shift to election of remedies.  The latter objection is sustained because Emisphere was prejudiced by the late notice in its ability to seek relevant discovery on issues such as Lilly's reliance on Emisphere's actions after the September 26, 2003 letter.  The defense is also without merit for the reasons stated in the text.

556, 561-63 (2d Cir. 1969), and *Bigda v. Fischbach Corp.*, 898 F. Supp. 1004, 1011-12 (S.D.N.Y. 1995); accord, *V.S. International, S.A. v. Boyden World Corp.*, 862 F. Supp. 1188, 1196 (S.D.N.Y. 1994).

The doctrine of election of remedies permits a victim of a breach to wait "a 'reasonable time' after learning of the alleged breaches before terminating the contract. . . . [H]ow much time is reasonable depends on the nature of the performance to be rendered under the contract." *ESPN*, 76 F. Supp. 2d at 393-94, quoting *Bigda*, 898 F. Supp. at 1012-13. The critical factor is not the passage of time but "whether the non-breaching party has taken an action (or failed to take an action) that indicated to the breaching party that [it] had made an election." *Id.*

Lilly relies on evidence that, in February 2004, Emisphere CEO Dr. Goldberg told investors in a public statement that Emisphere wanted to continue working with Lilly and to be paid as it believed it was entitled. Ex. 196. Also, while settlement negotiations proceeded, Lilly continued to work on the PTH project, including a new clinical study in April 2004 with Emisphere carrier 4-MOAC. Ex. 800. During the settlement negotiations, Emisphere proposed terms at various times that would not have involved termination of the agreements with Lilly. Over the summer of 2004, as prospects for settlement became even bleaker, Emisphere negotiated with Novartis to provide an exclusive license to Emisphere's carriers for use with PTH. The deal was contingent on Emisphere's termination

of the PTH License Agreement with Lilly.  Ex. 326.  On August 23, 2004, two days before a scheduled settlement conference with the court, Novartis said it was willing to go forward if Emisphere terminated the Lilly deal.  That same day, Emisphere sent a letter to Lilly terminating RCOA II and the PTH License Agreement.  Ex. 44.

In opposing the defense that evolved into election of remedies, Emisphere has relied on both testimony and documentary evidence concerning the parties' relationship between the time that Lilly filed suit on October 14, 2003 and the time Emisphere sent its termination letter on August 23, 2004.  Some of the evidence concerns meetings and other communications in which Lilly and Emisphere representatives met to discuss possible settlement of this lawsuit and the underlying disputes.  Lilly has objected to this evidence under Rule 408, which provides that evidence of conduct or statements made in compromise negotiations is not admissible to prove liability for or invalidity of a claim.

Rule 408, however, allows the admission of such evidence for another purpose, such as "negativing a contention of undue delay."  Lilly asserted first the affirmative defense of waiver to block Emisphere from terminating the PTH License Agreement.  By closing argument, Lilly abandoned waiver and argued election of remedies, which had not been pled as a defense.  Under either theory, those defenses are based primarily on the conduct of Emisphere during this period while negotiations were going on.  Lilly contends that the parties continued to work

-54-

together cooperatively during that time, which tends to rebut Emisphere's argument that Lilly's actions have so undermined the parties' relationship as to warrant termination for the breach.

Based on the language of Rule 408 allowing admission of evidence concerning conduct or statements made in compromise negotiations to rebut a contention of undue delay, the court has overruled Lilly's objections under Rule 408. This is a textbook example of legitimate use of evidence from settlement negotiations.

Turning to the merits of the defense, the evidence here does not show an election by Emisphere to continue the contract. The evidence shows instead that Emisphere (a) immediately notified Lilly of its view that Lilly had breached and that termination was justified, and that it intended to terminate if no solution could be reached, and (b) properly invoked the dispute resolution procedures the parties had agreed upon. See Ex. 40 (Sept. 26, 2003 letter notifying Lilly of breach). Lilly asked for and received Emisphere's permission to extend some deadlines, though Emisphere took care to point out that its agreement to delay was without prejudice to its rights. See Ex. 42. The parties negotiated for nearly a year but were never able to reach an agreement. Most important, Lilly has not come forward with evidence of any actions by Emisphere communicating to Lilly a choice to proceed with the contracts and not to terminate them. Accordingly, Lilly's description of Emisphere's actions as "holding breaches like trump cards

to be played whenever advantageous for that party to terminate a contractual relationship" is not at all accurate.  See Docket No. 125 at 7.

Emisphere participated in negotiations, as was entirely appropriate.   It is worth reminding Lilly that Emisphere, unlike Lilly itself, had invoked and followed the dispute resolution procedures they had agreed upon.  Emisphere also made public statements to shareholders indicating a desire to work out a settlement that would avoid termination.  Ex. 196.  But Emisphere always made clear to Lilly that it was participating in the negotiations on the basis that it retained its right to terminate the contracts.  There is no evidence to the contrary.

Quite simply, Lilly's election of remedies argument seeks to take unfair advantage of Emisphere's efforts to comply with the contractual dispute resolution procedures and its willingness to negotiate in good faith.  See *Seven-Up Bottling Co. (Bangkok) v. Pepsico, Inc.*, 686 F. Supp. 1015, 1024 (S.D.N.Y. 1988) (rejecting claim that settlement discussions barred termination:  "Plaintiff's claims in this regard give new meaning to the old, cynical aphorism that no good deed (in this case, a series of good deeds) shall go unpunished."); see also *AM Cosmetics, Inc. v. Solomon*, 67 F. Supp. 2d 312, 317-18 (S.D.N.Y. 1999) (attempts to resolve differences by agreement did not preclude termination).  The court need not find that Lilly was negotiating in bad faith after September 26, 2003, but Lilly is most definitely not entitled to take advantage of Emisphere's good faith by using the

-56-

unsuccessful settlement negotiations to remove Emisphere's principal strength in the bargaining.

Lilly relies heavily on the fact that Emisphere did not finally terminate the contracts until it thought it had a better deal with Novartis in August 2004.  That fact does not undermine Emisphere's right to terminate.  Emisphere is a small company with responsibilities to its shareholders.  The termination can have adverse consequences for Emisphere as well as for Lilly.  Emisphere acted reasonably  by exploring a compromise that might involve swallowing its anger and sense of betrayal, and continuing with the contracts.  At the same time, Emisphere had a right while negotiating with Lilly to plan for the possibility that no settlement would be reached and to see what other options were available to it.  And Emisphere acted within a reasonable time when it finally gave up on Lilly and terminated the contracts.

Lilly also contends that termination will harm it because it has spent tens of millions of dollars on the oral PTH efforts, and because Lilly's existing injectable PTH product will be vulnerable to competition if Lilly is not able to pursue oral delivery using the Emisphere carriers.  Tr. 569 (Khan); Tr. 393 (Martin).  The court has no doubt that termination will harm Lilly, but that harm is the direct consequence of Lilly's decision to pursue its own secret research on Emisphere's carriers in violation of the agreements with Emisphere.

C.     *Dispute Resolution Mechanism*

As mentioned above, the Lilly-Emisphere contracts include a dispute resolution mechanism requiring negotiations with senior management. Emisphere asserts that Lilly breached those terms of the contract by filing this lawsuit before the contractual procedure could be used.  The point is relevant to the election of remedies argument discussed above, for it helps undermine the defense by explaining why Emisphere negotiated rather than terminate immediately.  However, Lilly's breach of the contract in this respect does not support additional independent relief.  The court believes that Emisphere has waived any such claim by participating in this lawsuit without trying promptly to have the court stay, dismiss, or transfer the action on this basis.  See *Ernst & Young LLP v. Baker O'Neal Holdings, Inc.*, 304 F.3d 753, 756-58 (7th Cir. 2002) (affirming finding of waiver of contractual right to arbitration where party had participated in litigation for several months before asking for arbitration).[10]

X.     *Conclusion*

Lilly and Emisphere entered into a close, collaborative research relationship that required trust and good faith on both sides.  After several years of joint

---

[10]Lilly's answers to counterclaims have all asserted that "Emisphere's claims are barred because Emisphere did not follow the contractual procedures required to attempt to resolve disputes before filing its Counterclaims."  Docket No. 81 at 12.  Lilly did not pursue this defense at trial, and it does seem a little ironic in light of Lilly's quick filing (and slow service) of the lawsuit while it sought Emisphere's agreement to extend the time for negotiations under the agreed dispute resolution procedures.

research, Lilly decided it really did not need Emisphere any further, so it decided to pursue a secret research strategy in breach of its contractual obligations to Emisphere.   The parties in this case are both highly sophisticated and well-counseled businesses that have the right to try to exercise their full legal rights under the relevant contracts.   Lilly has asserted theories to justify its actions under the contracts, but those theories are not supported by the evidence or the law.  In the court's view, Lilly deliberately chose a course that was too aggressive, one that tried to sail too close to the wind.   The result is this lawsuit, the termination of the contracts, and the loss of much of Lilly's investment in the oral PTH program.  Accordingly, for the reasons set forth above, the court finds that Lilly breached the PTH License Agreement and RCOA II, and that the breaches entitled Emisphere to terminate both agreements effective August 23, 2004.  No separate judgment shall be entered at this time.   These findings of fact and conclusions of law decide only a portion of the case, and the portion does not appear suitable for a separate judgment under Rule 54(b) of the Federal Rules of Civil Procedure.

Date: January 6, 2006

DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Erin Roth Bohannon
BARNES & THORNBURG LLP
erin.bohannon@btlaw.com

Bruce E. Fader
PROSKAUER ROSE LLP
bfader@proskauer.com

Helen K. Geib
BARNES & THORNBURG LLP
helen.geib@btlaw.com

Steven H. Holinstat
PROSKAUER ROSE LLP
sholinstat@proskauer.com

Donald E. Knebel
BARNES & THORNBURG LLP
donald.knebel@btlaw.com

Dwight D. Lueck
BARNES & THORNBURG
dwight.lueck@btlaw.com

Michael Rabinowitch
WOODEN & MCLAUGHLIN LLP
mrabinowitch@woodmaclaw.com

Aliza Ross
PROSKAUER ROSE LLP
aross@proskauer.com

Colin A. Underwood
PROSKAUER ROSE LLP
cunderwood@proskauer.com

Maureen E. Ward
WOODEN & MCLAUGHLIN LLP
mward@woodmaclaw.com